UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

SHERIELEE FIGUEROA,

                              Plaintiff,          Case # 15-CV-6526-FPG

v.                                                DECISION AND ORDER

KK SUB II, LLC & JENNIFER HAMMEL,

                              Defendants.

## INTRODUCTION AND BACKGROUND

On September 3, 2015, Plaintiff Sherielee Figueroa brought this case for sexual harassment and retaliation against Defendants KK Sub II, LLC, John Pharo, and Jennifer Hammel pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000-e through 2000e-17, and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290-301. ECF No. 1. Plaintiff alleged that Defendants subjected her to sexual harassment and retaliation during her employment as a Subway store manager in Penfield, New York.

In April of 2017, Defendants filed summary judgment motions pursuant to Federal Rule of Civil Procedure 56(a) that the Court granted in part and denied in part on January 26, 2018.[1] ECF Nos. 35, 36, 41. The Court scheduled this case for trial on Plaintiff's remaining claims: retaliatory termination under Title VII and the NYSHRL against Defendant KK Sub II and aiding and abetting under the NYSHRL against Defendants Hammel and Pharo.[2] ECF No. 41 at 27; ECF No. 45.

---

[1] The Court dismissed Plaintiff's Title VII and NYSHRL claims against Defendant KK Sub II for sexual and retaliatory harassment. ECF No. 41 at 27.

[2] The parties agreed to dismiss Defendant Pharo from this case before trial began. ECF Nos. 71, 86.s

A jury trial began on July 6, 2018 that lasted five days and concluded on July 13, 2018. ECF Nos. 75-76, 81-83. The jury rendered a verdict in Plaintiff's favor and awarded $150,000 in compensatory damages and $275,000 in punitive damages. ECF Nos. 83, 84.

On July 26, 2018, Plaintiff moved for attorney's fees. ECF No. 87. On August 9, 2018, Defendants moved the Court to declare a mistrial or reduce the amount of damages awarded. ECF No. 93. On August 23, 2018, Plaintiff responded in opposition to Defendants' post-trial motion and filed a supplemental motion for attorney's fees to account for the fees incurred in doing so. ECF Nos. 96, 97. Defendants oppose both of Plaintiff's fee applications. ECF Nos. 104, 105, 106.

For the reasons that follow, Defendants' Motion for Post-Trial Relief (ECF No. 93) and Plaintiff's Attorney's Fee Motions (ECF Nos. 87, 97) are GRANTED IN PART and DENIED IN PART.

## DISCUSSION

### I. Post-Trial Relief Motion

Defendants ask the Court to grant them a new trial under Rule 59(a) or to reduce the amount of damages the jury awarded. As to damages, Defendants ask the Court to (1) eliminate the punitive damages award and (2) reduce the compensatory damages award to $35,000, or, alternatively, (3) reduce the total award of compensatory and punitive damages to $100,000 pursuant to the relevant statutory cap.

#### A. Request for a New Trial

Defendants argue that the Court should grant them a new trial due to the misconduct of Plaintiff's attorney, Anthony J. LaDuca. ECF No. 93-8 at 3-10. Specifically, Defendants assert that Mr. LaDuca had an unfair advantage at trial through his interaction with Brad Bradshaw, a

trial strategist and jury consultant, and that he misrepresented Mr. Bradshaw's true role to the Court and Defendants.[3]  *Id.*  Plaintiff opposes the request for a new trial.  ECF No. 96 at 1-4.

Under Rule 59(a), a court uses its discretion to determine "if counsel's conduct was so improper as to warrant a new trial."  *Crockett v. City of New York*, 720 F. App'x 85, 86-87 (2d Cir. 2018) (citation omitted) (summary order).  A court should grant a new trial "only if counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury."  *Id.* (citation omitted).

On July 6, 2018, before jury selection began, the following exchange occurred:

| | |
|---|---|
| **THE COURT:** | Anything else before we bring the jury in? |
| **MR. LADUCA:** | There was, Your Honor.  Mr. Bradshaw has worked with me for ten years, he does focus groups and he's also a professional jury assistant.  He won't sit with me during the trial, but he usually sits with me during this process. |
| **THE COURT:** | Okay.  The name? |
| **MR. BRADSHAW:** | Brad Bradshaw. |
| **THE COURT:** | Brad Bradshaw?  Thank you. |

ECF No. 93-4.

Despite his indication that Mr. Bradshaw would not sit with him during the trial, Mr. LaDuca asked the Court if Mr. Bradshaw could sit with him on the second day of trial.

| | |
|---|---|
| **MR. LADUCA:** | Your Honor, one other thing regarding exhibits, my assistant Brad Bradshaw does work with me when I'm using exhibits, have them pulled out of the book so I move quicker.  I would ask is it okay for him to sit at the table and have that ready for me? |
| **THE COURT:** | Sure, no problem. |

---

[3] Mr. Bradshaw is not an attorney.  He is a psychologist who helps attorneys conduct focus groups before trials to provide insight for jury selection and trial strategy.  ECF No. 88 at 9-11; ECF No. 88-4 at 2.

ECF No. 93-5 at 2.

That afternoon, however, the Court called the parties to sidebar when it realized that Mr.

Bradshaw was not performing the tasks Mr. LaDuca said he would.

| | |
|---|---|
| **THE COURT:** | What exactly is Bradshaw doing over there? He's not working on any documents, he's taking notes through this proceeding. I haven't seen him touch a single document. He cannot sit here as second chair. He's not admitted to this district. What's he doing? |
| **MR. LADUCA:** | He gives me documents sometimes. I don't have exhibits ready. That's what I'm asking — |
| **THE COURT:** | He's continuously taking notes. He's not going to be able to sit at the table. |
| **MR. LADUCA:** | He can take notes anywhere that — |
| **THE COURT:** | Let's go on the record. Mr. Bradshaw, what are you doing on the computer? |
| **MR. BRADSHAW:** | Taking notes. |
| **THE COURT:** | Of what? |
| **MR. BRADSHAW:** | What's being said. |
| **THE COURT:** | That's totally improper. Mr. LaDuca indicated you were here to help him with exhibits. You're excluded. Turn your computer off and sit in the audience. You're no longer allowed to sit at counsel table. |
| **MR. BRADSHAW:** | Will do. |

*Id.* at 2-3.

Defendants concede that "Mr. LaDuca did not misrepresent trial evidence at all," that his

"conduct did not directly touch on key evidence," and that "the conduct itself did not influence the

jury." ECF No. 93-8 at 8. They also concede that "there is nothing wrong with utilizing trial

strategists and/or jury consultants while preparing for trial." *Id.* at 9. Instead, Defendants assert

that Mr. Bradshaw's in-court assistance to Mr. LaDuca gave Plaintiff an unfair advantage. Defendants contend that because Mr. Bradshaw's true role was not revealed until they read Plaintiff's attorney's fees motion, they could not cross-examine trial witnesses about their interaction with Mr. Bradshaw. *Id.* at 6-7. The Court rejects this argument. There is no indication that Mr. Bradshaw interacted with Plaintiff or any trial witnesses—the fee application merely states that Mr. Bradshaw performed "edits" of direct and cross-examinations. ECF No. 88-6 at 2; *see also* ECF No. 88 ¶ 57.

Although the Court is displeased that Mr. LaDuca characterized Mr. Bradshaw as an exhibit organizer when that was not his role, the Court finds that this incident does not warrant a new trial. Mr. Bradshaw should not have been taking notes at the counsel table or offering real time advice to Mr. LaDuca, but those actions were short lived and did not "create[] undue prejudice or passion which played upon the sympathy of the jury." *Crockett*, 720 F. App'x at 87. Accordingly, a new trial is not warranted. *See Slack v. Cty. of Suffolk*, 50 F. Supp. 3d 254, 263 (E.D.N.Y. 2014) ("[T]he granting of a new trial is an extraordinary relief, and one that 'is properly granted only upon a showing of exceptional circumstances.'" (quoting *U.S. v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 391 (2d Cir. 2001)). However, as explained in greater detail in its discussion of the attorney's fee motions, the Court reduces Mr. Bradshaw's compensable hours.

### B. Request to Reduce Damages

Defendants ask the Court to (1) eliminate the punitive damages award and (2) reduce the compensatory damages award to $35,000, or, alternatively, (3) reduce the total amount of compensatory and punitive damages to $100,000 pursuant to the statutory cap.

## 1.     Request to Adjust Damages pursuant to the Statutory Cap

The Court first addresses Defendants' assertion that damages should be reduced in accordance with the statutory cap prescribed by 42 U.S.C. § 1981a(b)(3)(B).  ECF No. 93-8 at 16, 23.  Plaintiff agrees that a statutory cap applies, but disagrees as to the proper amount and argues that the Court should allocate the compensatory damages to her NYSHRL claim and the punitive damages to her Title VII claim.  ECF No. 96 at 9-11.

Under the statutory cap, the sum of compensatory and punitive damages awarded to a Title VII plaintiff cannot exceed $100,000 if the defendant has 101 to 200 employees in each of 20 or more calendar weeks in the current or preceding calendar year.  42 U.S.C. § 1981a(b)(3)(B).  If the respondent has 201 to 500 employees during that time, the sum awarded cannot exceed $200,000.  *Id.* § 1981a(b)(3)(C).

### a.     Number of Employees and Proper Cap on Damages

Defendants assert that Plaintiff's damages award should be reduced to $100,000 because KK Sub II had about 180 employees during the relevant period.  ECF No. 93-8 at 16, 23.  In support of this assertion, Defendants submit an affidavit from payroll manager Hiral Parikh wherein he affirms that KK Sub (not KK Sub, II, the defendant in this case) had an average of 179.25 employees during the relevant period based on the payroll records.  ECF No. 93-7.

Plaintiff asserts that her damages award should be reduced to $200,000 because Defendant KK Sub II had more than 450 employees during the relevant period.  ECF 96 at 9-10.  Plaintiff points to the following evidence in support of this argument.  First, KK Sub II provided records during discovery showing a roster of 475 employees.  ECF No. 96-1 ¶ 100 (citing ECF No. 96-4 at 4).  Second, there was a discussion at the June 8, 2018 pretrial conference indicating that

$200,000 was the applicable cap.[4]  ECF No. 96 at 9; ECF No. 96-1 ¶ 101 (citing ECF No. 96-5).

Finally, Annie Aggarwal, a part owner of KK Sub II and the head of Human Resources, testified

at trial that KK Sub II employed over 450 people in 2014.  ECF No. 96 at 9; ECF No. 96-1 ¶ 102

(citing ECF No. 96-3 at 6-7, 9, 30).

In reply, Defendants submitted an affidavit from Ms. Aggarwal wherein she explains that

she is in charge of Human Resources for both KK Sub, II, LLC (the defendant in this case) and

KK Sub, LLC (a different and separate entity) and that her trial testimony regarding the number

of employees was incorrect.  ECF No. 102 ¶¶ 3, 6.  Defendants also submitted a supplemental

affidavit from payroll manager Mr. Parikh, who asserts that Defendant KK Sub II had an average

of 179.25 employees and KK Sub had an average of 214 employees during the relevant period.

ECF No. 103 ¶¶ 3, 6.  Relying on Mr. Parikh's affidavit, Ms. Aggarwal explains that she oversaw

about 400 employees between both companies, but that Defendant KK Sub II only employed about

180 of them.  ECF No. 102 ¶ 6.

Based on the evidence above, the Court finds that Defendants are subject to the $200,000

statutory cap.  As Plaintiff points out, Defendants submitted a document in response to discovery

---

[4] The following exchange occurred at the pretrial conference:

> **MR. WHITE** (*attorney for KK Sub II*): Right.  And I just confirmed with counsel on point 11 at page 17 of Mr. LaDuca's memorandum, and I believe that Mr. LaDuca has taken a proper position there, he's correct, so we're not going to object to that.
>
> **THE COURT:**   What is that?  I'm sorry
>
> **MR. WHITE:**    Compensatory and punitive damages issue.
>
> **MR. FLEMING** (*attorney for Hammel*):  Caps, Judge, caps can't be mentioned, and Mr. LaDuca is correct about that.
>
> **THE COURT:**  The $200,000 cap, right?
>
> **MR. FLEMING:** Correct.

ECF No. 96-5 at 3.

demands that clearly says "KK SUB II" and "NUMBER OF EMPLOYEES (475)" at the top of the form and refers to the relevant period. ECF No. 96-4 at 4. Additionally, Ms. Aggarwal's trial testimony on KK Sub II's behalf indicated that it had over 450 employees during the relevant period.[5] ECF No. 96-3 at 4-7, 9, 30.

Now, after discovery has closed and the trial has concluded, Defendants assert that KK Sub II had only about 180 employees during the relevant period. Defendants provide no explanation to refute the discovery document that clearly describes KK Sub II as having 475 employees. As to Ms. Aggarwal's testimony, they merely assert that she was mistaken and rely on Mr. Parikh's affidavit to argue that KK Sub II only had about 180 employees during the relevant period.

---

[5] The following exchange occurred during Plaintiff's direct examination of Ms. Aggarwal:

> **MR. LADUCA:** Throughout my questions . . . I'm going to use the term "the corporation" and when I do that I want you to know I'm referring to KK Sub II, okay?
>
> **MS. AGGARWAL:** Okay.
>
> ***
>
> **MR. LADUCA:** [I]n prior testimony you were selected to speak on behalf of the corporation, true?
>
> **MS. AGGARWAL:** Yes.
>
> **MR. LADUCA:** And the corporation employed over 450 people in the year 2014?
>
> **MS. AGGARWAL:** Yes.
>
> ***
>
> **Mr. LADUCA:** And you're also the head of Human Resources, true?
>
> **MS. AGGARWAL:** Yes.
>
> **MR. LADUCA:** For all 450 plus employees, true?
>
> **MS. AGGARWAL:** Yes.
>
> ***
>
> **MS. AGGARWAL:** . . . I don't specifically look at each folder. I have over 450 employees.

ECF No. 96-3 at 4, 6, 7, 9, 30.

Defendants attach two charts that they created in attempt to support this calculation but do not submit any official payroll records or other documents showing how many employees KK Sub II had. This evidence does not credibly establish that KK Sub II had 180 employees, and Defendants cannot now rely on evidence that they failed to produce in discovery or offer at trial. *See Grace v. Corbis Sygma*, 535 F. Supp. 2d 392, 394 (S.D.N.Y. 2008) (noting that the plaintiff could not "now rely on documents that he failed to produce in discovery and did not offer at trial"). Accordingly, the Court determines that Defendants are subject to the $200,000 cap on damages pursuant to 42 U.S.C. § 1981a(b)(3)(C).

### b.    Allocation of Damages

While Title VII caps the sum of compensatory and punitive damages awarded, the NYSHRL does not cap the amount of compensatory damages awarded and punitive damages are not available. *Lewis v. Am. Sugar Ref., Inc.*, No. 14-CV-02302 (CRK), 2018 WL 4179053, at *2 (S.D.N.Y. Aug. 15, 2018) (citation omitted). "In the Second Circuit, when a party seeks recovery under multiple statutes and is successful in its suit, it may recover the awarded amount under the theory of liability that provides the most complete recovery." *Id.* (quotation mark and citation omitted); *see also Bick v. City of New York*, No. 95CIV.8781(KMW)(MHD), 1998 WL 190283, at *22 (S.D.N.Y. Apr. 21, 1998) ("Title VII was not intended to preclude a plaintiff from recovery under state law." (citation omitted)).

Here, the jury awarded $150,000 in undifferentiated compensatory damages. ECF No. 84 at 2. "Courts in this circuit have allocated all, or nearly all, of the awarded compensatory damages to the state law claim." *Lewis*, 2018 WL 4179053, at *2 (collecting cases). Accordingly, the Court allocates Plaintiff's $150,000 compensatory award to her successful NYSHRL claim and her $200,000 punitive award, as reduced by the statutory cap, to her successful Title VII claim. *See*

*Bick*, 1998 WL 190283, at *22 ("Since Title VII caps damages and state law does not, plaintiff's entire compensatory damage award in this case should be allocated to her successful [NYSHRL] claim."); *Funk v. F & K Supply, Inc.*, 43 F. Supp. 2d 205, 226 (N.D.N.Y. 1999) ("[W]hen punitive damages are interjected into the equation, compensatory damages can be recoverable under the [NYSHRL] claim, and punitive damages under the Title VII claim to the extent consistent with the Title VII statutory cap.") (citation omitted).

### 2.    Excessiveness of the Remaining Award

The Court next evaluates whether the compensatory and punitive damages are excessive.

### a.    Compensatory Damages

Defendants argue that the Court should reduce Plaintiff's compensatory damages from $150,000 to $35,000 because Plaintiff suffered only "garden variety" emotional distress. ECF No. 93-8 at 16-22. Plaintiff asserts that Defendants downplay the nature of her emotional distress and that the jury's award is appropriate. ECF No. 96 at 11-13.

Because Plaintiff's compensatory damages have been allocated to her state law claim, the Court must review the award under state law and consider whether it "deviates materially from what would be reasonable compensation." *McGrory v. City of New York*, No. 99 CIV.4062 FM, 2004 WL 2290898, at *13 (S.D.N.Y. Oct. 8, 2004) (citing N.Y. C.P.L.R. § 5501(c)). "This standard requires a more exacting review than the 'shocks the conscience' standard generally applied by federal courts, and is less deferential to a jury verdict." *Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306, 319 (S.D.N.Y. 2018) (quotation marks and citation omitted). To determine if an award deviates materially from what would be reasonable compensation, "district courts compare the jury's award to awards allowed in analogous cases involving similar types of

injuries," but "such earlier awards are not binding for purposes of the district court's review." *Id.* (alterations and citations omitted).

"Where a plaintiff has succeeded on her emotional distress claims, courts have upheld a range of awards for compensatory damages, basing their decisions on whether the emotional distress claim presented by plaintiff can be categorized as garden-variety, significant, or egregious." *DeCurtis v. Upward Bound Int'l, Inc.*, No. 09 CIV. 5378 RJS, 2011 WL 4549412, at *4 (S.D.N.Y. Sept. 27, 2011) (citation, quotation marks, and alterations omitted). "In garden-variety claims, the evidence of emotional harm is limited to the plaintiff's testimony, which describes his or her injuries in vague or conclusory terms, and fails to relate the severity or consequences of the injury. These claims typically lack extraordinary circumstances and are not supported by medical testimony." *Maher v. All. Mortg. Banking Corp.*, No. CV 06-5073 DRH ARL, 2010 WL 3516153, at *2 (E.D.N.Y. Aug. 9, 2010), *Report & Recommendation adopted*, 2010 WL 3521921 (Sept. 1, 2010) (internal citations omitted). "[P]laintiffs with garden-variety claims generally receive between $30,000 and $125,000."[6] *DeCurtis*, 2011 WL 4549412, at *4; *see also Meacham v. Knolls Atomic Power Lab.*, 381 F.3d 56, 78 (2d Cir. 2004), *vacated on other grounds sub nom. KAPL, Inc. v. Meacham*, 544 U.S. 957 (2005) (noting that "New York cases vary widely in the amount of damages awarded for mental anguish"—many reduce awards to $30,000 or below while others "uphold awards of more than $100,000 without discussion of protracted suffering, truly egregious conduct, or medical treatment" (citations omitted)).

---

[6] Defendants cite an Eastern District of New York case from 2005 indicating that courts generally award $5,000 to $35,000 in damages for "garden variety" distress claims (ECF No. 93-8 at 17-18); however, recent case law demonstrates that the appropriate range is typically $30,000 to $125,000. *See, e.g.*, *Bouveng*, 175 F. Supp. 3d at 330 (collecting cases).

Emotional distress damages must be "reasonably related" to the defendant's discriminatory conduct. *Id.* (citation omitted). A court considers "the duration of a complainant's condition, its severity or consequences, any physical manifestations, and any medical treatment." *Id.* (citation omitted). A court must also "determine how the award compares with others awarded for similar injuries and whether it is supported by evidence before the jury." *Id.* (citation omitted). "[W]hen a court is convinced that the jury's award is entirely out of proportion to the plaintiff's injury, and was motivated by sympathy rather than by evidence of harm, remittitur is the appropriate remedy." *Bouveng v. NYG Capital LLC*, 175 F. Supp. 3d 280, 328-29 (S.D.N.Y. 2016)

Here, Plaintiff and her mother, Olympia Santiago, testified at trial as to Plaintiff's emotional distress due to Defendants' actions. No medical professional testified about Plaintiff's emotional state and no medical records or other corroborating items were admitted into evidence.

Plaintiff testified that she experienced her first anxiety attack after she was fired from KK Sub II. As a result, she went to see a doctor who gave her depression and anxiety medications. Plaintiff testified that she took those medications for three months until she got a new job, because they made her feel sick and drowsy. Plaintiff also testified that she was the sole provider for her husband and three children and that they lost the lease on their apartment after she was fired. As a result, Plaintiff and her family had to move in with Plaintiff's mother who provided for them financially. Plaintiff testified that this hurt her and was a difficult situation. Plaintiff also stated that she could not care for her children for a few months after she was fired because she was depressed, did not want to do anything, and cried a lot.

Ms. Santiago testified that Plaintiff did not have anxiety before KK Sub II fired her. After she was fired, Plaintiff was devastated and went to see a doctor who prescribed her medications. Ms. Santiago explained that Plaintiff and her family came to live with her for about three months

and, during that time, Plaintiff was constantly crying in her room, did not pay attention to her husband or kids, slept a lot, and gained about 30 pounds.

Considering the evidence presented at trial and the relevant case law, the Court concludes that Plaintiff's alleged emotional distress resembles garden-variety claims, but that compensation of $150,000 is not excessive. The trial testimony revealed that Plaintiff suffered anxiety, stress, depression, and weight gain, cried often, sought medical attention, took mental health medications, and experienced a difficult change in her living situation and family dynamic. This emotional distress was reasonably related to Defendants' discriminatory conduct, as Plaintiff and Ms. Santiago both testified that Plaintiff did not have anxiety before she was fired. Based on this evidence, it is not appropriate to reduce Plaintiff's compensatory damages because the Court is not "convinced that the jury's award is entirely out of proportion" to Plaintiff's injury and "was motivated by sympathy rather than by evidence of harm." *Bouveng*, 175 F. Supp. 3d at 328-29 (citation omitted). Accordingly, the Court awards Plaintiff $150,000 in compensatory damages.

### b. Punitive Damages Award

Defendants argue that the Court should eliminate the punitive damages award because it is excessive. ECF No. 93-8 at 10-15. Plaintiff opposes this request. ECF No. 96 at 4-9.

### i. Entitlement to Punitive Damages

To award punitive damages on a Title VII claim, "a jury must find by a preponderance of the evidence that a defendant's conduct is not only actionable but exhibits either 'malice' or a 'reckless indifference to the federally protected rights of an aggrieved individual.'" *Tse v. UBS Fin. Servs., Inc.*, 568 F. Supp. 2d 274, 309 (S.D.N.Y. 2008) (quoting 42 U.S.C. § 1981a(b)(1)) (other citation omitted).

Here, one of the trial exhibits contained Defendant KK Sub II's "Company Policies," which expressly forbid retaliatory behavior. For this reason, "[t]he jury was entitled to find that [D]efendant's retaliatory actions toward [P]laintiff in apparent violation of its own anti-discrimination policy met the 'reckless indifference' threshold and, thus, punitive damages were within the jury's discretion to award." *Tuszynski v. Innovative Servs., Inc.*, No. 01-CV-6302, 2005 WL 221234, at *4 (W.D.N.Y. Jan. 29, 2005); *see also Kennedy v. Supreme Forest Prods., Inc.*, No. 18-221-CV, 2019 WL 459755, at *3 (2d Cir. Feb. 6, 2019) (summary order) ("[A]n inference of willful discrimination is further supported by trial evidence establishing that [the defendant] distributed an employee handbook discussing applicable regulations—thus demonstrating knowledge of related law."). Thus, the Court will not eliminate the punitive damages award.

### ii.   Excessiveness of the Remaining Punitive Damages

As discussed above, the Court already reduced punitive damages to $200,000, the sum that Congress authorized under the relevant statute. This is particularly important because "only where an award would shock the judicial conscience and constitute a denial of justice, for example because it would result in financial ruin of the defendant or constitute a disproportionately large percentage of a defendant's net worth and thereby violate due process, should the court reduce an award of punitive damages to below the appropriate cap." *Kennedy*, 2019 WL 459755, at *4 (citing *Luciano v. Olsten Corp.*, 110 F.3d 210, 221 (2d Cir. 1997)). Defendant KK Sub II does not argue that $200,000 would "result in financial ruin" or "constitute a disproportionately large percentage" of its net worth.

Although it is inclined to find the punitive damages award appropriate on this basis alone, the Court will nonetheless briefly analyze the relevant factors for determining whether a punitive damages award is excessive. Those factors are: (1) the degree of reprehensibility of the

defendant's misconduct; (2) the disparity between the actual or potential harm the plaintiff suffered, i.e., compensatory damages, and the punitive damages award; and (3) the difference between the punitive damages awarded and the civil penalties authorized or imposed in comparable cases. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003).

### (a)  Reprehensibility

Defendants argue that their actions were not reprehensible because they fired Plaintiff for soliciting false statements from employees that she supervised.   ECF No. 93-8 at 11-12. Defendants assert that "Plaintiff's termination was in no way an act of retaliation for Plaintiff's report of alleged sexual harassment.   Instead, Defendant Hammel determined that Plaintiff had abused her supervisory position by soliciting false statements from her subordinates."  *Id.* at 12. This argument is unpersuasive, however, because the jury expressly rejected this explanation when it found that Defendants retaliated against Plaintiff in violation of her rights.

"[P]unitive damages have been awarded in many employment discrimination cases, based on the same general reprehensive discriminatory conduct."  *Cioffi v. New York Cmty. Bank*, 465 F. Supp. 2d 202, 214 (E.D.N.Y. 2006) (citation omitted) (finding $195,000 in punitive damages appropriate for the plaintiff's successful Title VII retaliation claim and noting that "[t]he jury rejected [the defendant's] contentions as a pretext for discrimination").   The trial evidence demonstrated that Defendants retaliated against Plaintiff when they fired her the day after she filed a complaint of sexual harassment with the New York State Division of Human Rights.   The punitive damages award, as reduced by the statutory cap, appropriately reflects the jury's perception of the reprehensibility of Defendants' conduct.

**(b)     Ratio of Punitive to Compensatory Damages**

There is no "bright-line ratio" that a punitive damages award cannot exceed; however, "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm*, 538 U.S. at 425; *see also Philip Morris USA v. Williams*, 549 U.S. 346, 351 (2007) ("[T]he longstanding historical practice of setting punitive damages at two, three, or four times the size of compensatory damages, while not binding, is instructive, and . . . single-digit multipliers are more likely to comport with due process." (quotation marks, alterations, and citation omitted)).

Here, the ratio of punitive damages ($200,000) to compensatory damages ($150,000) is 1.33 to 1; the Court finds this ratio appropriate and within the bounds of due process. *See, e.g.*, *Cioffi*, 465 F. Supp. 2d at 215 (upholding punitive damages award based on jury's finding of sexual harassment and retaliation where ratio between punitive and compensatory damages was less than 2:1); *Iannone v. Frederic R. Harris, Inc.*, 941 F. Supp. 403, 415 (S.D.N.Y. 1996) (reducing punitive damages to achieve a 2:1 ratio of punitive to compensatory damages where the employer's conduct was serious but not "repugnant" and involved a single discriminatory incident).

**(c)     Comparable Cases**

"[B]ecause the punitive damage is capped by Title VII, the amount awarded is not out of line with awards in similar cases or comparable penalties authorized by law." *Oliver v. Cole Gift Ctrs., Inc.*, 85 F. Supp. 2d 109, 115 (D. Conn. 2000); *see also Lewis*, 325 F. Supp. 3d at 370 (noting that "[c]omparable cases in the context of Title VII claims are constrained by the statutory caps"). Indeed, comparable cases have awarded similar punitive damages awards. *See, e.g.*, *Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 589 (S.D.N.Y. 2010) (reducing the punitive damages award from $350,000 to $200,000 in accordance with the statutory cap and noting that "[i]n several Title

VII cases involving retaliation or intentional discrimination, courts have upheld punitive damages awards exceeding $200,000") (collecting cases); *Cioffi*, 465 F. Supp. 2d at 215 (finding that "the [punitive damages] award of $195,000 in this case is within the bounds capped by Title VII"). Thus, the Court finds the $200,000 punitive damages award appropriate under the circumstances.

Accordingly, for the reasons stated, Defendants' Motion for Post-Trial Relief (ECF No. 93) is GRANTED IN PART and DENIED IN PART. The Court denies Defendants' request for a new trial and awards $200,000 in punitive damages for Plaintiff's Title VII claim in accordance with the statutory cap and $150,000 in compensatory damages for Plaintiff's NYSHRL claim.

## II.     Attorney's Fee Motions

Plaintiff's original and supplemental attorney's fee motions request a total of $292,002.50 in fees and $7,652.61 in costs with interest. ECF No. 89 at 14, 18-19; ECF No. 97-1 at 2-3. Defendants oppose Plaintiff's motions and ask the Court to deny them entirely or to significantly reduce the fees awarded.[7] ECF Nos. 104-06. For the reasons that follow, the Court awards Plaintiff (1) $204,116.23 in attorney's fees; (2) $6,574.11 in costs; (3) and post-judgment interest beginning July 17, 2018 in accordance with 28 U.S.C. § 1961.

A court has discretion to award reasonable attorney's fees and expenses to a prevailing party under Title VII. 42 U.S.C. § 2000e-5(k); *see also* Fed. R. Civ. P. 54(d)(1) (providing that costs "should be allowed to the prevailing party"). "Because of the district court's familiarity with the quality of the representation and the extent of the litigation, the decision whether to award fees and the amount of fees awarded are issues generally confined to the sound discretion of the court."

---

[7] Defendants request a hearing on the issue of attorney's fees. The Court denies this request because it has enough information available to decide these motions without oral argument. *See* Loc. R. Civ. P. 7(c) ("In its discretion, the Court may notify the parties that oral argument shall not be heard on any given motion.").

*Cush-Crawford v. Adchem Corp.*, 94 F. Supp. 2d 294, 301 (E.D.N.Y. 2000), *aff'd*, 271 F.3d 352 (2d Cir. 2001).

"To determine the amount of attorneys' fees, a court must calculate the 'presumptively reasonable fee,' which the Second Circuit has instructed requires consideration of 'the case-specific variables' to ascertain a reasonable hourly rate and the reasonable number of hours required by the case." *Costa v. Sears Home Improvement Prods., Inc.*, 212 F. Supp. 3d 412, 417 (W.D.N.Y. 2016) (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, 522 F.3d 182, 190 (2d Cir. 2008)).   The prevailing party "bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Id.* (quotation marks and citation omitted).

### A.      Calculation of the Reasonable Hourly Rates

According to Plaintiff's fee applications, four timekeepers worked on this case—Mr. LaDuca, as lead trial attorney; Michael Steinberg, a local attorney who helped Mr. LaDuca with research, writing, and trial strategy; Mr. Bradshaw, a trial strategist and jury consultant; and Mary Jane Kemnitz, a paralegal at Mr. LaDuca's firm.   Plaintiff sets forth the following hourly rates for these individuals:

| TIMEKEEPER | YEARS OF PRACTICE | HOURLY RATE |
|---|---|---|
| Mr. LaDuca (attorney) | 24 | $375 |
| Mr. Steinberg (attorney) | 29 | $300 |
| Mr. Bradshaw (non-attorney) | 17 | $100 |
| Ms. Kemnitz (paralegal) | 14 | $125 |

ECF No. 89 at 14.

Defendants argue that these hourly rates are unreasonable and should be reduced to $225-250 for Mr. LaDuca and Mr. Steinberg and $75 for Ms. Kemnitz; they do not offer a suggested hourly rate for Mr. Bradshaw's time. ECF No. 105 at 5-7; ECF No. 106 at 3.

To calculate a presumptively reasonable fee, a court "must ascertain the rate a paying client would be willing to pay." *Costa*, 212 F. Supp. 3d at 419 (quotation mark and citation omitted). To do this, the Court considers the so-called *Johnson* factors, based upon the decision in *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87, 92-93 (1989). Those factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Costa*, 212 F. Supp. 3d at 419 (citing *Anello v. Anderson*, 191 F. Supp. 3d 262, 282-83 (W.D.N.Y. 2016)). A court "should also bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively" and that "such an individual might be able to negotiate with his or her attorneys, using their desire to obtain the reputational benefits that might accrue from being associated with the case." *Id.* (citation omitted).

Although, Mr. LaDuca achieved great success on Plaintiff's behalf, this case was not complex—it involved standard sexual harassment and retaliation claims. Moreover, Mr. LaDuca and Mr. Steinberg do not concentrate their practice in labor and employment litigation. Mr. LaDuca admits that he "do[es] not concentrate [his] practice solely on employment law" (ECF No.

88 ¶ 18); rather, he apparently focuses on personal injury matters.[8] Mr. LaDuca also admits that Mr. Steinberg has "not worked on a large number of these cases" (ECF No. 107 ¶ 10) and Mr. Steinberg's biography reveals the same (ECF No. 88-3 at 2-3).

The rates Plaintiff seeks are also higher than those typically allowed for representation in this context. Plaintiff did not cite any similar case from this District that allowed this level of hourly rates.[9] The hourly rates typically awarded in this District for a similar case are "$225-$250 for partner time or senior associate time, $150-$175 for junior associate time, and $75 for paralegal time." *Costa*, 212 F. Supp. 3d at 420-21 (collecting cases). Recently, United States District Judge Elizabeth A. Wolford awarded Mr. LaDuca $300 per hour for his time in a similar case, but in doing so she noted that Defendants did not contest that award and that $300 per hour "is at the high end" of typical awards in this District for similar cases. *Id.* at 420.

Accordingly, after considering the relevant factors and in light of the above discussion, the Court sets Mr. LaDuca's hourly rate at $300 in accordance with Judge Wolford's decision in *Costa*; Mr. Steinberg's hourly rate at $250 because he is an experienced attorney but was less involved in this case than Mr. LaDuca; and Mr. Bradshaw and Ms. Kemnitz's hourly rate at $75 per hour, the prevailing rate for paralegal time, because neither is an attorney.

---

[8] *See Costa*, 212 F. Supp. 3d at 420 (noting that Mr. LaDuca's "practice has mainly focused on personal injury matters"); *see also* LaDuca Law Firm, *available at* http://www.laducalawfirm.com/our-attorneys/tony-laduca/ (indicating that Mr. LaDuca concentrates his practice "in the areas of civil litigation and personal injury matters, which includes but is not limited to: automobile accidents, construction-related accidents, wrongful death, and traumatic brain injury cases") (last visited Mar. 6, 2019).

[9] The Western District of New York cases that Plaintiff cites that awarded higher hourly rates (ECF No. 89 at 14-15) are inapplicable because they are not Title VII cases and in several of them the reasonableness of the hourly rate was undisputed. Although the Court can consider other types of cases in its analysis, "the most relevant authority are those cases dealing with reasonable hourly rates for plaintiff's attorneys in Title VII cases, or other similar employment discrimination or civil rights cases." *Costa*, 212 F. Supp. 3d at 420 n.5.

**B.  Calculation of the Reasonable Number of Hours**

As required, Plaintiff submitted contemporaneous time records that specify "the date, the hours expended, and the nature of the work done." *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998); ECF Nos. 88-1, 97-1 (Mr. LaDuca's time); ECF No. 88 at 7-9 & ECF No. 97-1 (Mr. Steinberg's time); ECF No. 88-6 (Mr. Bradshaw's time); ECF No. 88-8 (Ms. Kemnitz's time). Plaintiff's original attorney's fee motion seeks reimbursement for 964.57 hours of work: 599.44 hours by Mr. LaDuca, 100.7 hours by Mr. Steinberg, 188.3 hours by Mr. Bradshaw, and 76.13 hours by Ms. Kemnitz.  ECF No. 89 at 14.

After applying the reduced hourly rates set forth above, the Court calculates the remaining fees Plaintiff seeks as follows:

| TIMEKEEPER | HOURS | COURT-APPROVED HOURLY RATE | TOTAL FEE |
|---|---|---|---|
| Mr. LaDuca (attorney) | 599.44 | $300 | $179,832 |
| Mr. Steinberg (attorney) | 100.7 | $250 | $25,175 |
| Mr. Bradshaw (non-attorney) | 188.3 | $75 | $14,122.50 |
| Ms. Kemnitz (paralegal) | 76.13 | $75 | $5,709.75 |
| **TOTAL** | **964.57** | | **$224,839.25[10]** |

A court does not have to conduct a "line-by-line analysis" of an attorney's fee application because it is not realistic or practical to expect a trial judge to evaluate and rule on every entry. *Costa*, 212 F. Supp. 3d at 424 (citing *Kirsch*, 148 F.3d at 173); *Walker v. Coughlin*, 909 F. Supp. 872, 881 (W.D.N.Y. 1995).  Thus, "many courts have endorsed percentage cuts as a practical means of trimming fat from a fee application." *Walker*, 909 F. Supp. at 881 (quotation mark and

---

[10] This amount excludes the fees sought in Plaintiff's supplemental motion, which the Court addresses separately below.

citations omitted); *see also, e.g.*, *Anello*, 191 F. Supp. 3d at 284 (reducing hours by 50% to bring the fee application "into the realm of reasonableness").

Defendants argue that the hours claimed are excessive because the issues in this case were straightforward and the hours exceed what courts have found reasonable in similar cases. ECF No. 106 at 5-8. Defendants also argue that Plaintiff's fee application contains 62 "multiple task billing entries." ECF No. 106 at 6. By Defendants' calculation, these entries amount to 231.13 hours of work. *Id.* In support of this argument, Defendants submitted a copy of Mr. LaDuca's time sheet and highlighted entries that they assert are improper. ECF No. 105-1. Defendants ultimately ask the Court to "significantly reduce" the number of hours Plaintiff requests "by a flat percentage to an amount commensurate with the simple nature of the legal issues involved." ECF No. 106 at 8. They do not suggest an amount by which the Court should reduce Plaintiff's requested award or point to any specific time entries they claim are excessive, aside from the 62 entries noted above.[11]

The Court agrees with Defendants that the hours expended in this case were excessive given the nature of the claims. Although counsel's preparation certainly contributed to Plaintiff's success at trial, the trial lasted only five days and involved only two claims against two defendants.

---

[11] In contravention of the Court's Local Rules of Civil Procedure, Defendants attempt to make several arguments in their attorney affirmations. Specifically, they argue that Plaintiff's requested attorney's fees should be reduced because the Court dismissed "approximately one-half of the allegations" on summary judgment; Mr. LaDuca overbilled for activities like drafting the Complaint, preparing for depositions, and researching; and Mr. LaDuca acted in "bad faith" by refusing to submit a counteroffer to two settlement offers from Defendants. ECF No. 104 ¶¶ 4-19; ECF No. 105 ¶¶ 13-29. These arguments do not appear in Defendants' memorandum of law. ECF No. 106.

The Court's Local Rules state that "[a]n affidavit must not contain legal arguments, but must contain factual and procedural background relevant to the motion it supports." Loc. R. Civ. P. 7(a)(3). The Rule also warns that "[f]ailure to comply with this requirement may constitute grounds for resolving the motion against the non-complying party." *Id.* Accordingly, the Court will not consider the arguments raised in Defendants' attorney affidavits. *See, e.g.*, *Danford v. City of Syracuse*, No. 5:09-CV-0307 GTS/ATB, 2012 WL 4006240, at *4 & n.11 (N.D.N.Y. Sept. 12, 2012) (citing a similar Local Rule and determining that "the Court need not, and does not, consider the legal arguments contained in Plaintiff's 'attorney affidavit'") (collecting cases).

As a result, it is unreasonable that, by the Court's calculation, the timekeepers in this case devoted approximately 780 hours to trial preparation and the trial itself, resulting in fees around $200,000.

The Court also agrees with Defendants that several of Mr. LaDuca's billing entries contain multiple tasks, instead of separating those activities and making it clear how much time was spent on each item. Some records also contain vague descriptions of the task performed, like "research" or "letter to Court" without further specification. *See, e.g.*, ECF No. 88 at 7-8; ECF No. 88-1 at 5, 8, 9. Many of the records are redundant, where two or more individuals billed for the same event like a telephone conference or meeting with each other. *See, e.g.*, ECF No. 88-1 at 6, 8-9 & ECF No. 88-6 at 2 (double-billed calls between Mr. LaDuca and Mr. Bradshaw); ECF No. 88-1 at 6-8 & ECF No. 88 at 8-9 (double-billed meetings and calls between Mr. LaDuca and Mr. Steinberg).

> In assessing whether an attorney's time was reasonably expended, the Court must ask whether the attorney exercised billing judgment. As the Supreme Court has explained, counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. In the private sector, billing judgment is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority.

*Anderson v. Rochester-Genesee Reg'l Transp. Auth.*, 388 F. Supp. 2d 159, 163 (W.D.N.Y. 2005) (alteration, quotation marks, and citation omitted).

The Court credits Mr. LaDuca's representations that the time submitted was incurred on Plaintiff's behalf, but it

> also recognizes that a timekeeper's pen may be more heavily weighted when recording time that will never end up on a bill being sent to a paying client. The typical billing judgment restraints that an attorney employs when recording time related to work for a paying client often do not come into play when working on a contingent fee case.

*Costa*, 212 F. Supp. 3d at 425; *see* ECF No. 88 ¶ 5 (Mr. LaDuca's attorney affirmation indicating that he worked for Plaintiff on a contingency-fee basis).

In light of the excessive amount of time spent on trial and the time entries that contain multiple tasks and are redundant or vague, the Court determines that it must reduce the number of hours for which a fee will be awarded. Despite the hard work of Plaintiff's team in litigating this case, "the Court also must be cognizant of the fact that even though Defendants must pay Plaintiff's reasonable attorneys' fees, they should not have to pay more than a client in this context would have been willing to pay." *Costa*, 212 F. Supp. 3d at 426.

As noted previously, the Court intends to reduce Mr. Bradshaw's hours in light of the misrepresentation about his role at trial. The Court agrees with Judge Wolford, who recently found that, although "Bradshaw Consulting added value to this case on behalf of Plaintiff, particularly since in the Court's estimation a different jury may very well have reached a different result, it is nonetheless hard-pressed to justify the presence of Mr. Bradshaw throughout the entire trial." *Id.* at 428. Accordingly, as Judge Wolford did in *Costa*, the Court reduces Mr. Bradshaw's requested hours by 40%. This reduces his hours from 188.3 to 112.98 which, at the Court-approved rate of $75 per hour, results in a total award of $8,473.50.

After making this adjustment, the remaining fee Plaintiff seeks is calculated as follows:

| TIMEKEEPER | HOURS | COURT-APPROVED HOURLY RATE | TOTAL FEE |
|---|---|---|---|
| Mr. LaDuca (attorney) | 599.44 | $300 | $179,832 |
| Mr. Steinberg (attorney) | 100.7 | $250 | $25,175 |
| Mr. Bradshaw (non-attorney) | 112.98 | $75 | $8,473.50 |
| Ms. Kemnitz (paralegal) | 76.13 | $75 | $5,709.75 |
| **TOTAL** | **889.25** | | **$219,190.25** |

Considering this already-reduced amount and the factors set forth above, the Court determines that an additional 10% reduction is appropriate, for a total award of $197,271.23 in reasonable fees (excluding the supplemental application discussed below).

### C.    Supplemental Fee Application

After Defendants moved for post-trial relief, Plaintiff submitted a supplemental application for $8,656.25 in attorney's fees incurred in responding to that motion.  ECF No. 97-1.

As an initial matter, the supplemental fee application has a mathematical error—Mr. LaDuca claims that he spent 7 hours and 35 minutes responding to Defendants' motion (ECF No. 97-1 ¶ 4), but the time records submitted add up to 6.15 hours of work (*Id.* ¶ 3).  After making this adjustment, Plaintiff's supplemental fee application can be broken down as follows:

| TIMEKEEPER | HOURS | HOURLY RATE | TOTAL FEE |
|---|---|---|---|
| Mr. LaDuca (attorney) | 6.15 | $375 | $2,306.25 |
| Mr. Steinberg (attorney) | 20 | $300 | $6,000 |
| **TOTAL** | **26.15** | | **$8,306.25** |

ECF No. 97-1 at 2.

As with the initial fee application, the Court reduces Mr. LaDuca's hourly rate to $300 and Mr. Steinberg's hourly rate to $250.  This adjustment reduces the supplemental application to a request for $6,845 in fees ($1,845 for Mr. LaDuca and $5,000 for Mr. Steinberg).

The supplemental fee application contains some vague entries such as "research" and "review motion," but generally contains descriptive and non-redundant entries.  Since the requested amount has already been reduced by about 21%, the Court finds that a further reduction is not warranted and awards $6,845 in fees for Plaintiff's supplemental application.

### D. Costs

Plaintiff's attorney's fee motions seek a total of $7,652.61 in costs. ECF No. 89 at 18-19; ECF No. 97-1 ¶ 14. "It is well-settled that attorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." *Marisol A. ex rel. Forbes v. Giuliani*, 111 F. Supp. 2d 381, 401 (S.D.N.Y. 2000) (quotation marks and citation omitted). Some examples of these types of expenses include photocopying fees, travel expenses, telephone costs, and postage. *Id.* (citation omitted); *see also, e.g.*, *Rozell v. Ross-Holst*, 576 F. Supp. 2d 527, 547 (S.D.N.Y. 2008).

Most of the costs Plaintiff seeks are for the case filing fee, subpoenas, witnesses, transcripts, printing, and the like. *See* ECF No. 88-2 at 2; ECF No. 97-2 at 2. The Court finds that such costs are reasonable and should be reimbursed.

Defendants object only to Plaintiff's request for reimbursement of costs associated with the jury focus group that Mr. Bradshaw conducted. ECF No. 106 at 10-11. Specifically, they argue that Plaintiff should not be reimbursed $1,078.50 for "Cash withdrawal (focus group)" or $668.50 for Mr. Bradshaw's flight to and from Rochester for the focus group, because those costs are unreasonable and not "incidental and necessary" to representing Plaintiff. *Id.* at 10 (citing ECF Nos. 88-2, 88-7). The Court declines to eliminate Mr. Bradshaw's travel expenses as those are reasonable out-of-pocket expenses that are typically reimbursed. The Court will, however, strike the $1,078.50 for "Cash withdrawal (focus group)" because, without any additional explanation, it is unclear that this is a reasonable out-of-pocket expense that attorneys incur and ordinarily charge to clients—it does not resemble any of the typical costs that are generally recoverable. Accordingly, the Court reduces Plaintiff's costs by $1,078.50 and concludes that Plaintiff should recover $6,574.11 in costs.

### E.     Interest

Plaintiff asserts that she is entitled to statutory post-judgment interest on the award for attorney's fees and costs.  ECF No. 89 at 12.  Defendants do not discuss this issue in their memorandum in opposition to Plaintiff's attorney's fee motions.  ECF No. 106.

Pursuant to 28 U.S.C. § 1961(a), "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court" and the federal rate set forth in that statute governs the award.  *Lewis v. Roosevelt Island Operating Corp.*, No. 16CV03071ALCSN, 2018 WL 4666070, at *11 (S.D.N.Y. Sept. 28, 2018) (citations omitted).  A plaintiff "is entitled to post-judgment interest on [her] attorneys' fees and costs commencing on the date the Clerk's Office entered judgment and ending on the date of payment."  *Id.* (citing *Gamble v. E. Bronx N.A.A.C.P. Day Care Ctr., Inc.*, No. 04-cv-1198, 2008 WL 2115237, at *3 (S.D.N.Y. May 15, 2008) (quotation mark omitted)); *see also Alston v. Wall St. Garage Parking Corp.*, No. 03 CIV.5418 RLC JCF, 2004 WL 1194595, at *2 (S.D.N.Y. May 28, 2004) (finding that "[t]he plaintiff is entitled to post-judgment interest under 28 U.S.C. § 1961 on all sums awarded" including attorney's fees and costs).

Accordingly, Plaintiff is entitled to post-judgment interest on the fees and costs awarded beginning on July 17, 2018, when the Clerk's Office entered judgment in this case (ECF No. 85), until Defendants pay the amount due.  The parties will calculate the appropriate amount using the formula set forth in 28 U.S.C. § 1961.

For the reasons stated, Plaintiff's Attorney's Fee Motions (ECF Nos. 87, 97) are GRANTED IN PART and DENIED IN PART.  The Court awards Plaintiff (1) $204,116.23 in attorney's fees; (2) $6,574.11 in costs; and (3) post-judgment interest beginning July 17, 2018 in accordance with 28 U.S.C. § 1961.

**CONCLUSION**

Defendants' Motion for Post-Trial Relief (ECF No. 93) is GRANTED IN PART and DENIED IN PART. The Court denies Defendants' request for a new trial and awards $200,000 in punitive damages and $150,000 in compensatory damages.

Plaintiff's Attorney's Fee Motions (ECF Nos. 87, 97) are GRANTED IN PART and DENIED IN PART. The Court awards Plaintiff (1) $204,116.23 in attorney's fees; (2) $6,574.11 in costs; and (3) post-judgment interest beginning July 17, 2018 in accordance with 28 U.S.C. § 1961.

IT IS SO ORDERED.

Dated: March 11, 2019
      Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court